UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MANUEL CANABAL, | § | |
| DANIEL GOMEZ FERREIRO, | § | |
| PROMOTORA VILLA MARINO, C.A. | § | |
| individually and on behalf of a class | § | |
| of all others similarly situated | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. _____ |
| | § | |
| WILLIS OF COLORADO INC., | § | |
| WILLIS GROUP HOLDINGS LTD., | § | |
| AMY S. BARANOUCKY, | § | |
| ROBERT S. WINTER, and | § | |
| BOWEN, MICLETTE & BRITT, INC. | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT - CLASS ACTION**

NOW COME PLAINTIFFS, Manuel Canabal, Daniel Gomez Ferreiro and Promotora Villa Marino, C.A., individually and on behalf of a class of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Original Complaint - Class Action against Defendants, WILLIS OF COLORADO INC., WILLIS GROUP HOLDINGS, LTD., AMY S. BARANOUCKY, ROBERT S. WINTER, and BOWEN, MICLETTE & BRITT, INC. (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

## I. PREFACE

1.

This putative class action is filed in representation of a class of defrauded Venezuelan investor clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial"). This

action has been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities & Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management LLC, et al.*, in the United States District Court for the Northern District of Texas– Dallas Division (the "SEC Action").   This action alleges participation by these Defendants in the massive investment fraud scheme perpetrated by the Stanford Financial Group and its principals from, by and through Texas that led to the intervention by the SEC in Texas and appointment of Ralph Janvey as Receiver.

## II.  **PARTIES**

2.

Plaintiff, Manuel Canabal, is a citizen of the Venezuela residing in the Venezuela.

3.

Plaintiff, Daniel Gomez Ferreiro, is a citizen of the Venezuela residing in the Venezuela.

4.

Plaintiff, Promotora Villa Marino, C.A., is a Venezuelan company with its principal place of business in Venezuela which is wholly owned and controlled by Venezuelan citizens.

5.

Additionally, this case seeks certification of a class of Venezuelan investors who purchased Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. at any time from said company's inception to the present.

6.

Defendant Willis of Colorado Inc., ("Willis Colorado") is a corporation organized under the laws of Colorado.  Willis has engaged in business in the State of Texas, and maintains a designated agent for service of process in Texas.  Willis may be served by servings its registered agent, CT

Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201.

7.

Defendant Willis Group Holdings Ltd., ("Willis Group") is a corporation organized under the laws of Bermuda, with its principal place of business in the United Kingdom. Willis has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas. Willis may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). Defendant may be served via its registered agent in Bermuda: Appleby, Canon's Court, 22 Victoria Street, Hamilton, Bermuda.

8.

Defendant, Amy S. Baranoucky, ("Baranoucky") is an individual and, upon information and belief, United States citizen, currently residing in 4295 Columbine Drive, Unit 8, Vail, CO 81657-4767. Defendant Baranoucky may be served with process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

9.

Defendant, Robert S. Winter, ("Winter") is an individual and, upon information and belief, United States citizen, currently residing in 10015 Olympia, Houston Texas 77042. Defendant Winter may be served with process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

10.

Defendant Bowen, Miclette & Britt, Inc. ("BMB") is a corporation organized under the laws of Texas.   BMB may be served by servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201.

### III.   SUBJECT MATTER JURISDICTION

11.

This Court has original jurisdiction over this proceeding pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action because this lawsuit constitutes a judicial proceeding against certain agents "related to the Receivership Estate".   This Court has original jurisdiction over this proceeding, pursuant to 28 U.S.C. §1332(d)(2)(B) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which all members of the Plaintiff class are citizens and residents of Venezuela and at least one Defendant (BMB) is a citizen of Texas.

### IV.   PERSONAL JURISDICTION

12.

This Court has personal jurisdiction over the non resident Defendants, Willis and Baranoucky, under the Texas Long Arm Statute.   Defendant Willis Colorado has conducted continuous and systematic business in the State of Texas for many years and maintains a registered agent for service of process in Texas for that reason, and is therefore subject to general jurisdiction. Defendant Willis Group has conducted continuous and systematic business in the State of Texas, both directly and via its subsidiaries, affiliates, and agents, for many years and therefore is subject to general jurisdiction. Furthermore, Willis Group, either directly or through its subsidiaries, affiliates and agents, including Baranoucky, has engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore has done business and committed torts, in part, in the

State of Texas. Based on its general and specific contacts with the State of Texas, Defendant Willis Group has purposefully availed itself of the privilege of conducting activities within Texas and has established minimum contacts with the State of Texas under the Long Arm Statute.

13.

Defendant Baranoucky has engaged in specific jurisdictional contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, including the transmittal to Houston, Texas of the "safety and soundness" letters described herein and attached hereto as Exhibit "4", that give rise to Plaintiffs' causes of action, and therefore has done business and committed torts, in part, in the State of Texas. Based on her specific contacts with the State of Texas, Defendant Baranoucky has purposefully availed herself of the privilege of conducting activities within Texas and has established minimum contacts with the Texas under the Long Arm Statute.

## V. VENUE

14.

Venue is mandatory in this Court pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action.

## VI. FACTUAL BACKGROUND

### A.      The Stanford Financial Empire

15.

From the mid-1980s through February 2009, R. Allen Stanford ("Stanford") built a financial service empire that at its height boasted 30,000 customers in 130 countries allegedly managing $50 billion dollars in investment funds. The empire was comprised of over 140 companies from across the globe that operated under the brand name "Stanford Financial" with its worldwide headquarters

located in Houston, Texas. The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: Houston, Texas-based Stanford Group Company ("SGC") and Stanford Capital Management, LLC ("SCM"); Stanford International Bank ("SIB") and Stanford Trust (one in Louisiana and another in Antigua), all of which were controlled and managed from the United States, principally Houston, Texas. In Venezuela, Stanford Financial operated under the names Stanford Corporate Services, Stanford Bank Venezuela and Stanford Group Venezuela Asesores de Inversion, C.A. all of which were ultimately owned by Stanford Financial.

16.

Begun initially as an offshore banking operation in the mid-1980s, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer services worldwide from its headquarters base in Houston, Texas. Stanford Financial gave all the appearances of a highly successful outfit, with lavish offices in some of the world's premier cities. Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

17.

The most important facet underlying the Stanford Financial empire, and the key to its success and sustainability, was the carefully crafted Stanford Financial image. The Stanford Financial image, cultivated over the years, was one of success, prestige, and, most importantly, safety and solidity. The Stanford Financial image was centered around and built upon money – the money Stanford Financial received from its investor clientele. With the money it received from its clients, Stanford Financial was able to project an image of success and solidity. From the marble and mahogany of the Houston headquarters, to the huge bonuses paid to lure and retain top producers, to the

helicopters and private jets that flew the Stanford Financial executives around, Stanford Financial

oozed money, thus lending an air of legitimacy to the Stanford "myth".

18.

Charitable giving and sponsorships of sporting events and teams, as well as massive political

contributions, constituted additional pillars supporting the Stanford Financial image.  As with

everything else, Stanford spent lavishly on philanthropic endeavors, giving to hospitals, theaters and

museums, and sponsoring sports teams and celebrities such as the Miami Heat and Vijay Singh, all

with the objective, once again, of sustaining the Stanford Financial image.  Stanford made a huge

splash in the world cricket establishment in particular.  Stanford also gave generously to political

campaigns and urged his employees to do the same as well, to the tune of millions of dollars.

19.

Stanford Financial obtained the money it needed to perpetuate its image from one primary

source:  the sale of Certificates of Deposit from the Antiguan offshore bank wholly owned and

controlled by Stanford himself – SIB.  Clients who were introduced to the Stanford Financial group

quickly found out that the main financial product being peddled by the group was the SIB CD.  The

SIB CDs were sold worldwide by a web of different Stanford Financial promoter companies whose

sole function was the sale of the SIB CDs.  By 2009, SIB had sold over $7.2 billion in CDs.

**B.     Stanford Financial's Operations in Venezuela**

20.

Stanford opened its Stanford Bank Venezuela in Venezuela and Stanford Group Venezuela

Asesores de Inversion, C.A. ("Stanford Venezuela").  Stanford Venezuela was a direct subsidiary of

SGC in Houston.  Stanford Venezuela was set up specifically to serve as a "representative office" of

Stanford Financial in Venezuela and to sell SIB CDs to Venezuelan citizens.  Stanford Venezuela

grew rapidly by "head hunting" financial advisers and their books of client business from other companies. All of the financial advisers in the Stanford Venezuela offices had one primary mission -- to sell SIB CDs for Stanford Financial. Like their counterparts in the United States, Stanford Venezuela financial advisers were paid outsized commissions for the sale of the CDs.

21.

Since Houston was the administrative nerve center and principal base for the Stanford Financial/SIB worldwide sales force, all of the sales practices of Stanford Venezuela were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial. All of the sales practices, directives, techniques, strategies and reward programs were developed and crafted in Houston and disseminated down to Venezuela to be implemented there by the Stanford Financial Advisors. All of the sales force training manuals, promotional literature and materials for SIB, including the Spanish-language promotional materials, were created, printed, packaged and mailed from Stanford's Houston headquarters to Stanford Venezuela to be utilized by the local Venezuelan sales force. In addition, sales training for the Venezuelan sales force for SIB was conducted principally in Houston (known to the Venezuelan financial advisers as the "Houston experience"). In those training sessions, sometimes twice a year, the Venezuelan financial advisers were trained to sell the Stanford Financial image. The Stanford Financial "script" for why SIB was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled and drilled again into their heads. The advisers were thereafter subjected to examinations to reinforce the script and sent back to Venezuela to aggressively sell the SIB CDs.

22.

The Houston administrative center of Stanford Financial managed all aspects of the operations of Stanford Venezuela and reported directly to Allen Stanford. Under this direction, the

financial advisers were charged with "*captacion*", which is a Spanish term for essentially "capturing" investment funds, for Stanford Financial. The act of "*captacion*" for a foreign, offshore investment company or bank that is not registered in Venezuela is improper. Stanford Financial did everything in its power to disguise and otherwise hide the nature of Stanford Venezuela's operations, including sales of SIB CDs by Stanford Venezuela, which was specifically established to lend "cover" and an air of legitimacy to Stanford Venezuela's operations and allow the Stanford Financial sales agents in Venezuela to continue to sell the SIB CDs.

23.

One way Stanford Financial sold CDs in Venezuela, also improper, was through SGC brokers from Houston or Miami. On a regular basis, SGC brokers from Houston and/or Miami traveled to Venezuela to solicit and sell SIB CDs and "*captar*" investments funds from Venezuelan citizens for Stanford Financial. The SGC brokers regularly flew to Venezuela and set themselves up in posh hotels, and met with their Venezuelan clients to market and sell the SIB CDs.

24.

As part of the Stanford Financial sales process, Venezuelan citizens and residents like Plaintiffs were uniformly "sold" the Stanford Financial "image". They were uniformly informed by the Stanford Financial brokers and advisers, whether from Stanford Venezuela or from SGC in Houston, that, *inter alia*, investments in the SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government. Indeed many Venezuelan investors to this day never understood that they had invested in CDs issued by an Antiguan bank, but always thought their money was invested in Houston, Texas. Venezuelan investors like Plaintiffs were also told by Stanford Financial sales agents that the CDs issued by SIB were safer even than U.S. bank–issued CDs because Stanford

Financial had unique Lloyds of London insurance policies in place that went above and beyond FDIC insurance;  and that investments in the CDs were liquid and the CDs could be redeemed at any time because SIB, through Stanford Financial, invested the money in safe, secure and liquid assets.

**C.       Perpetuation of the Stanford Image -- the Root of the Fraud**

25.

What attracted the investors from Venezuela to Stanford Financial was the expertly crafted perception that Stanford Financial, including SIB, was (1) a United States-based operation and (2) was completely insured to such a level that investments in SIB were safer and more secure than investments in CDs issued by U.S. banks insured by the FDIC.

26.

All of the Stanford Financial advisers from SGC who traveled to Venezuela to sell the CDs for SIB, as well as the local Venezuelan sales agents for Stanford Venezuela, were trained to intentionally "blur the lines" that separated SIB from the U.S. operations of Stanford Financial and to sell the image and perception that SIB was part and parcel of the Stanford Financial "group" based in Houston, Texas.   And all of the Stanford sales agents, whether from SGC or from Stanford Venezuela, were also trained to push and emphasize to Plaintiffs and the Class that their investments in SIB were insured by Lloyd's of London and/or other prominent insurers and were therefore safer than deposits in U.S. banks.

27.

These representations were repeated in the promotional materials for Stanford Financial and SIB that were designed and generated in Houston and then handed to SGC advisers headed for sales presentations in Venezuela or forwarded to Stanford Venezuela for distribution directly to clients in Venezuela. SIB itself never had a sales force or marketing or promotional arm in Antigua. The head

of the global sales force for SIB was located in the United States, principally in Houston, Texas.
See, e.g., June 12, 1996 letter from Stanford Financial vice president Rossana Roys, attached hereto
along with certified English translation as **Exhibit "1"** and made a part hereof for all purposes
(describing to a potential investor that Stanford Financial handles all of the promotional activities for
SIB from its "purely American" base in Houston, Texas). Therefore all of the sales, marketing and
promotional activities for Stanford Financial and SIB occurred in Texas.

28.

The sales and promotional materials created in Texas and distributed uniformly in Venezuela
blurred the lines between Antigua-based SIB and the other U.S.-based Stanford Financial entities,
including SGC, and created the false impression that SIB and Stanford Financial (SGC ) were one
and the same and therefore that SIB enjoyed the same regulation and protections as a U.S.-regulated
company. As the U.S. Receiver has stated, "Stanford's financial advisors used the apparent
legitimacy offered by U.S. regulation of Stanford's U.S. brokerage subsidiary in order to generate
sales of SIBL CDs worldwide."[1]

29.

A true and correct sample of one example of the sales and promotional materials used in
Venezuela, along with certified English translation, is attached hereto as **Exhibit "2"**. This
promotional piece distributed in Venezuela falsely states that investments in SIB were more secure
than investments in FDIC-insured U.S. banks. *Id.* The promotional materials described various
"unique" insurance polices from Lloyd's that insured the clients' investments in SIB. *Id.* These and
other promotional materials routinely utilized by Stanford Financial and distributed to its client base,
including Plaintiffs and the Class, uniformly failed to disclose the amounts of the coverage afforded

---

1 "Report of the Receiver Dated April 23, 2009" in the SEC Action [docket #336], at 7.

by the referenced insurance policies, thereby intentionally creating the impression that the insurance

policies provided coverage for <u>all</u> investments in SIB. *Id.*

30.

The promotional materials go on to describe how, in order to qualify for the insurance

policies, SIB was audited annually by Lloyds, and was also subjected to annual risk analyses, which

"*provides another safety element for the clients.*" *Id.*

31.

In another Spanish language promotional piece circulated in Venezuela, Stanford Financial

described how, "*in order to guarantee and provide higher security to its clients*", SIB had a special

insurance policy that covered SIB's financial transactions "*in case of loss, fraud or theft*". A true and

correct sample of said promotional piece used in Venezuela is attached hereto as **Exhibit "3"**. It

goes on to say that "[*t*]*his policy is extremely hard to acquire and few banks are able to satisfy the

requirements to obtain it.*" *Id.* It then lists Defendant BMB as the "administrator" of the insurance

policies for SIB. *Id.*

32.

The Spanish-language promotional materials also intentionally blurred the lines between SIB

and SGC in order to create the impression in the minds of the average investor that SIB was insured

by SIPC. *See* Exhibit "2". The promotional literature belittles the protections afforded by the FDIC,

and then clearly and unambiguously suggests that SIB was guaranteed and insured by the NASD and

SIPC, going so far as to state in bold letters that "*Stanford International Bank is probably the only

International Bank that offers this type of security to its clients*". *Id.*

33.

The attached Spanish-language promotional materials, and other similar materials, were

created by the Stanford Financial marketing team in Houston, Texas and then approved and authorized for distribution in Venezuela and for use by Stanford Venezuela sales agents in the sale of SIB sales.

34.

Stanford's sales agents and promotional materials were not enough, however. To complete the fraudulent sales pitch, particularly regarding the safety and soundness of an investment in SIB, Stanford needed "back up". He got it from Stanford Financial's insurance brokers.

**D.   Defendants Willis and BMB's Participation in Stanford's Fraud**

35.

Defendants Willis and BMB became willing participants in the perpetuation of the Stanford fraud.   Apparently at the request of Stanford Financial, Willis and BMB, as a part of their professional services as insurance agents, brokers, risk managers and/or insurance consultants, over the years (and apparently every year) provided Stanford Financial in Houston with certain "safety and soundness" letters for SIB with the clear intention that they be used for marketing purposes to retain or obtain actual and prospective clients for SIB. See true and correct copies of 1996, 1998 and 2004 letters from BMB, signed by Robert S. Winter, and the 2006 letter from Willis, signed by Amy S. Baranoucky, attached as **Exhibit "4"** hereto and made a part hereof for all purposes.   In doing so, both Willis and BMB crossed the line from being mere insurance brokers for the Stanford Financial group, to joining the Stanford Financial/SIB sales force, essentially acting as sales agents for the Texas-based investment company. Willis in particular, put its internationally known and respected brand name behind Stanford Financial and SIB, thereby lending recognition and credibility to Stanford Financial and SIB and supporting its sales efforts.

36.

The "safety and soundness" letters are remarkable in that they all use identical language to describe SIB. Indeed, upon information and belief, the text of the letters was actually written by Stanford Financial employees in Houston and sent to Willis and Bowen to be placed on their letterhead, signed, and sent back. Nevertheless, as a part of their professional services as insurance brokers, risk managers, insurance agents and/or insurance consultants BMB and Willis, through their employees, including but not limited to, Robert Winter and Amy Baranoucky routinely signed these letters. The letters tout SIB as being, *inter alia*, "*professional*" and comprised of "*first class business people*". *Id.* The BMB and Willis letters also proclaim that SIB is insured by various Lloyd's insurance policies, "placed" by Defendants for SIB. Like the Spanish-language SIB promotional materials described above, the BMB and Willis letters uniformly fail to disclose the amounts of the coverage afforded by the referenced insurance policies, thereby (and when coupled with the SIB promotional materials) intentionally creating the impression that the insurance policies provided coverage for <u>all</u> investments in SIB.

37.

Also similar to the SIB promotional materials attached hereto, the BMB and Willis letters represent that the Lloyd's policies were only issued because SIB had "qualified" for said policies by undergoing (and apparently passing) "*stringent Risk Management Review[s] conducted by an outside audit firm*" (emphasis added). *Id.*

38.

These letters, which were clearly designed and intended by Defendants to be distributed to Plaintiffs and other actual and prospective investors in Stanford Financial/SIB, contain untruths and omissions of material facts directed at Plaintiffs with the purpose of promoting and selling SIB and

its CD products to Plaintiffs.  Defendants Willis and BMB had no reasonable basis to make the statements contained in the letters because they knew or should have known (and were therefore reckless in communicating information to the contrary) that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by an "outside" audit firm, but rather were conducted by a one man "mom and pop" audit shop in Antigua that was dominated completely by Allen Stanford and Stanford Financial to the extent that it was not "outside" or independent at all.

39.

Moreover, as the insurance brokers for Stanford Financial, Defendants Willis and BMB knew that SIB was part of the Stanford Financial group and was being operated from Houston, Texas, and that the SIB CD products were being marketed and sold by Stanford Financial from by and through Houston, Texas.  All communications between Willis and/or BMB and Stanford Financial or SIB flowed through Houston, Texas, and the letters attached in Exhibit "4" were all routed by Defendants to Stanford Financial personnel in Houston, Texas with full knowledge that the letters were designed to be used by Stanford Financial in Houston Texas to promote and sell SIB CDs to clients in, *inter alia*, Venezuela.  In fact, a formal procedure was established at Stanford Financial whereby a Stanford Financial employee in Houston, Barbara Fortin, served as the "gatekeeper" for the "safety and soundness" letters.  Therefore both BMB and Willis were generally aware that they were involved assisting a group that was impermissibly operating as an investment company selling unregistered securities from, by and through Houston, Texas.

40.

In creating and submitting these letters into the stream of commerce, with full knowledge of their intended use, Defendants Willis and BMB actively and materially aided Stanford Financial to

perpetrate the massive Ponzi scheme now alleged by the SEC. Indeed, the letters attached as Exhibit "4" constitute fraud by omission because they intentionally omit material facts, including the scope of coverage of the referenced insurance policies, and the fact that Defendants had "no idea" one way or the other when, or even whether, the alleged "Risk Management reviews" were conducted, or whether they were "stringent" by any definition. Moreover, to the extent that the letters refer to an "outside audit firm" performing the reviews, the letters omit to mention that the reviews were conducted by a one man "mom and pop" accounting firm in Antigua that had strong and long lasting personal connections to Allen Stanford himself such that the supposedly "independent" audit firm was in reality completely dominated by Stanford and Stanford Financial.

41.

Even worse, the letters issued by BMB completely fail to mention that the signatory thereto, Robert S. Winter, was in fact a member of the Board of Directors of SIB. Instead the BMB letters give the distinct impression that BMB is a wholly unrelated company providing an unbiased outside "opinion" about SIB.

42.

Certainly, BMB and Willis, in distributing these letters to Stanford Financial with the clear understanding that they would be redistributed to clients, engaged in severely reckless and misleading conduct designed with one goal in mind --- to advance the business goals of their client Stanford Financial. BMB and Willis also consistently, year after year, allowed their names to be mentioned prominently in SIB's Annual Reports, alongside Allen Stanford and Jim Davis and the rest of the SIB Board of Directors and the Management of SIB, therefore lending more legitimacy to the overall operations of Stanford Financial and SIB.

### E.    The Stanford Reality

43.

The reality of the Stanford Financial empire was that it was nothing but a massive, worldwide Ponzi scheme. The Stanford Financial companies operated together as a single business joint enterprise dedicated to the fraudulent sale of SIB CDs, which sales were the lifeblood of the entire enterprise. The master manipulator and salesman, Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level. Using the island of Antigua as a "safe haven", Stanford became a true international financial "pirate", absolutely intent on operating an "outlaw" investment company completely outside the regulatory confines of the laws of any country, whether the United States, Antigua, Venezuela or elsewhere.

44.

Stanford Financial began to grow exponentially beginning in 2000. In 2001, Stanford filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. residents through SGC brokers in the United States. Stanford thereafter began the practice of "head hunting" for U.S. brokers and financial advisers, paying enormous signing bonuses to financial advisers to leave their jobs at other firms and transfer their book of clients over to Stanford Financial. Once at Stanford Financial, these same financial advisers were then pressured into promoting and selling SIB CDs to their clients, and were rewarded with outsized bonuses or fired, sued to recover the bonuses and blackballed in the industry if they refused to cooperate and sell the CDs. Fueled by this influx of veteran brokers and investment advisers, Stanford Financial grew from 6 branch offices in the United States to more than 25 between 2004 and 2007.

45.

From 2000 to 2008 Stanford Financial grew into a high-powered sales and marketing

juggernaut. The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" and "Superstars". In order to market and sell the SIB CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial brokers and financial advisers, including those in Venezuela, to "push" the SIB CDs on investors like Plaintiffs. SIB paid disproportionately large commissions to its Stanford Financial brokers and advisers for the sale of CDs; they received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD. Stanford Financial used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

46.

Beginning in 2003 Stanford's strategic plan to lure top financial advisers away from their employers to work for Stanford Financial began to back-fire as several U.S. advisers renounced their new position with Stanford and lodged complaints with FINRA f/k/a the NASD, including charges that Stanford Financial was running a massive Ponzi scheme. Some of the advisers were fired for refusing to promote and sell the SIB CDs to their clients. Between 2003 and 2006 over a dozen Stanford Financial advisers and employees, including Leyla Basagoitia in 2003 and Lawrence J. DeMaria in 2006, were discharged or resigned amid allegations of fraudulent practices at Stanford Financial.

47.

The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company hedge fund or mutual fund from, by and through Houston, Texas in the guise of operating an offshore bank in Antigua. In essence, SIB, acting through the Stanford Financial

international network of brokers and advisers, lured (*"captaba"*) money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then pooled all of the investors' money together to make investments in various illiquid and high risk assets worldwide – the very definition of an investment company. As such, in reality Stanford Financial was selling "shares" in an unregistered investment company to Plaintiffs and others from, by and through Houston, Texas. As a result of that reality, the SEC has alleged that SIB and SGC violated the §7(d) of the Investment Company Act. SIB was never registered or authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or the Class in Venezuela, who were consistently and uniformly told verbally and via the Stanford Financial promotional materials that SIB was part and parcel of the Stanford Financial group based in Houston, Texas, authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London insurance coverage.

48.

Besides the fraud committed on Plaintiffs and the Class based on the marketing of Stanford Financial and SIB as being one and the same and completely insured, Stanford Financial also touted the high liquidity of SIB's investment portfolio. For example, in its marketing materials, Stanford Financial emphasized the importance of the liquidity of the SIB CD, stating, under the heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security

to SIB clients..." To ensure that depositors could redeem their CDs, Stanford, through its brokers and advisers, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice. But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.6 billion; (2) private equity and (3) real estate.

49.

Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to acquire private equity and real estate. In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate. By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua. The rest of the money from investors was just blown by Stanford on creating and perpetuating the image charade with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige. None of this was disclosed to Plaintiffs and the Class.

50.

As alleged in the SEC Second Amended Complaint and in the criminal Indictment of Allen Stanford and the others, Stanford and his CFO Jim Davis "fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio.  Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements.  Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn.  Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments.  SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis signed these falsified financial statements."[2]

51.

At the end of the day, the entire Stanford Financial empire was dominated completely by one man—Allen Stanford.  Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis.

52.

In running the Stanford Financial empire from the United States, Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants.  The SIB Board of Directors included Stanford's 81 year old father and his 85 year old friend, O.Y. Goswick.  Moreover

---

2        SEC Second Amended Complaint, at ¶4.

nepotism predominated within Stanford Financial, where the upper level management team was comprised of a tightly linked web of friends and family of Stanford and Davis. Just as Stanford brought in his old friend Davis, Davis in turn brought in his protégé, the young Laura Pendergest-Holt, whom Davis had met at the Mississippi Baptist church where Davis was a Sunday school teacher. In turn, Perndergest-Holt's cousin Heather Sheppard was an "equity specialist" at Stanford Financial, while her sister's husband, Ken Weeden, was Stanford Financial's managing director for investments and research. Jim Davis' brother in law, Danny Bogar, served as SGC's President and ran Stanford Financial's operations for the entire United States. Davis' son Zack also worked for Stanford Financial as an "equity specialist".

53.

There also existed serious issues in Stanford Financial's accounting department as evidenced by the fact that both lead accountants were recently indicted. As alleged in the Indictment and the SEC's Second Amended Complaint, Gilberto Lopez was the Chief Accounting Officer for Stanford Financial, and yet he was not a licensed CPA. Mark Kuhrt, also indicted, served as the Global Controller for Stanford Financial, and yet was not a licensed CPA either. These two non-CPAs were in charge of accounting for a global financial services company with (allegedly) $50 billion "under advisement".

54.

By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIB CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States. It was at the end of 2008, in the midst of the worldwide financial meltdown, that Stanford Financial began to stumble.

55.

As alleged by the SEC and the United States Justice Department, in order to cover up a hole in SIB's balance sheet that would cause it to fall below minimum capital requirements, in 2008 Stanford and Davis concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of property he purchased for $63 million and transferred it to some entities who "booked" it at $3.2 billion and then transferred shares in those entities back to SIB.

56.

In October 2008, Venezuelan financial analyst Alex Dalmady performed a rudimentary review of SIB's returns over the years as a favor for a friend. In December 2008 Stanford Financial's clearing firm, Pershing, informed Stanford Financial that it would no longer process wire transfers from SGC to SIB for the purchase of CDs. Stanford Financial began suffering liquidity problems that prevented SIB from complying with client requests for transfers of funds. This had a huge impact on the ability of the financial advisers at Stanford Venezuela to keep clients pacified.

57.

In January 2009, in the wake of the Madoff scandal, Dalmady published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings. Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck". The cat was out of the bag.

58.

The U.S. federal authorities then issued subpoenas to Stanford Financial. In advance of a deposition before the SEC, Stanford Financial officials met with outside counsel in Miami on February 4, 2009. Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Allen

Stanford an e-mail, that reads in part, that "*things are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means. There are real bullets out there with my name on, David's name and many others and they are very real…[w]e are all in this together.*"   See true and correct copy of e-mail dated February 6, 2009 from Frans Vingerhoedt to Allen Stanford, attached hereto as **Exhibit "5"** (originally attached as Exhibit "A" to the Receiver's Appendix to Response to Examiner's Report and Recommendation No. 1 in the SEC Action [docket 442]).

59.

On February 17, 2009 the United States Securities and Exchange Commission ("SEC") filed a Complaint against SGC and SIB, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions". The SEC obtained an injunction and froze the assets of the Stanford Financial group and appointed a receiver, Ralph Janvey to liquidate the companies.

60.

The SEC, through its Second Amended Complaint, has now alleged a fraud of shocking magnitude. The SEC alleges that Stanford, together with his co-conspirators, engineered and carried out a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and SIB into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his private harem of women and their children; a fleet of jets; yachts; and mansions in several different countries. On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation and money laundering.

## VII. PLAINTIFFS' INVESTMENTS

### 61.

All Plaintiffs invested in the Stanford Financial charade by purchasing CDs or placing their money in other investment accounts from and with SIB. Over the years that Plaintiffs purchased and maintained investments in SIB, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial representatives or via Stanford Financial promotional materials, that, *inter alia*: (1) an investment in SIB was safer than investing in U.S. banks because SIB did not make loans but instead invested in safe and highly liquid instruments; (2) SIB and Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB was completely safe and secure because it was guaranteed and insured by Lloyd's, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.

### 62.

During the time that Plaintiffs purchased and maintained investments in SIB, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*: (1) SIB was not regulated by the U.S. Government; (2) Plaintiffs' investments in SIB were not insured; (3) SIB was operating illegally as an unregistered investment company soliciting and selling unregistered securities by, from and through Houston, Texas; (4) that SIB was not invested in safe secure and liquid instruments; and (5) that SIB was audited by a one man "mom and pop" audit shop under the control of Allen Stanford and SIB was not subjected to stringent risk management examinations.

### 63.

Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial sales representatives and via Stanford Financial promotional materials, Plaintiffs decided to invest money in, and maintain investments in,

the SIB CDs.

64.

**Manuel Canabal**.

Plaintiff Manuel Canabal ("Canabal") invested in SIB CDs through Stanford Venezuela. Canabal's Stanford Financial Advisor always promoted the SIB CDs to Canabal and to Canabal the CDs appeared to be the only investment product offered by Stanford Financial. In making the initial decision to invest with Stanford Financial, Canabal received information from his Stanford Financial Advisor regarding Stanford Financial's operations as a whole, and also was informed by his Stanford Financial Advisor that investments in SIB were insured. Canabal relied on those statements in making the decision to invest in the CDs and in deciding to maintain his investments in SIB CDs over the years.

65.

Canabal asked his Stanford Financial Advisor if the CDs were guaranteed by the FDIC, and the advisor explained that the CDs were not FDIC insured but did carry other types of insurance, including insurance covering fraud. Ultimately, when the discussions turned to insurance, his Stanford Financial Advisor picked up the telephone and called someone at Stanford to deliver to Canabal the insurance "safety and soundness" letters from Defendants BMB and Willis, one of which is attached as Exhibit "4". Canabal received said letters from Defendants BMB and Willis and relied on said letters as "peace of mind" regarding the stability and safety of his investments in SIB.

66.

**Daniel Gomez Ferreiro.**

Plaintiff Daniel Gomez Ferreiro ("Ferreiro") invested in Stanford Financial via Stanford Venezuela. During his meetings with his Stanford Financial Advisor his advisor always convinced Ferreiro to invest and reinvest in the SIB CDs by touting the bank's safety and solidity and the fact that the investments were insured. In making her decisions to invest in Stanford Financial Ferreiro was provided with copies of the BMB and Willis "safety and soundness" letters.

67.

**Promotora Villa Marino, C.A.**

Plaintiff Promotora Villa Marino, C.A. ("Promotora") is a Venezuelan corporation whose principal place of business is in Venezuela and which is wholly owned by Venezuelan citizens from Venezuela. The principal of Promotora was solicited as a client for Stanford Financial.

68.

Promotora thereafter received the BMB and/or Willis letters every single year that it maintained investments with Stanford Financial, and continued to invest in SIB CDs per the advice of its Stanford Financial Advisor and maintained the relationship over the years with Stanford Financial through its Stanford Financial Advisor. The Stanford Financial Advisor promoted the SIB CDs aggressively as being fully insured.

69.

As part of the sales pitch, at the initiation of Promotora's investments in SIB CDs, and every year thereafter, The Stanford Financial Advisor sent the "safety and soundness" letters from Defendants BMB and Willis, one of which is attached hereto as Exhibit "4" to Promotora's principal. These letters gave a great level of comfort to Promotora's principal and caused Promotora

to continue to invest with Stanford Financial over the years.

## VIII.  PLAINTIFF CLASS

70.

Plaintiffs are all citizens and residents of Venezuela who, in many cases, invested their life savings and retirement funds with Stanford Financial (through SIB) because they considered Stanford Financial a safe investment company because it was allegedly "based" in the United States and therefore subject to U.S. laws and regulations.  In reliance on Stanford Financial's fraudulently crafted "image" as a Texas-based financial services group, and in further reliance on the illusion of safety and security via Lloyd's insurance coverage fostered by Stanford Financial with the Defendants' material assistance, Plaintiffs transferred hundreds of millions of dollars to Stanford for investment in SIB.

71.

Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs continued to receive monthly account statements from Stanford showing that their money had been invested in the SIB CDs and were in fact profitable.  Throughout this time period, and up until the SEC intervention in February 2009, Plaintiffs continued to receive, or were shown or informed about, the fraudulent letters from Defendants Willis and BMB attesting to SIB's security, solvency and solidity.  At no time were Plaintiffs ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures similar to a hedge fund, or that SIB had no real insurance that would protect Plaintiffs' investments, or that the only "oversight" SIB was subjected to was a one man "mom and pop" audit firm in Antigua that was completely dominated by Stanford.  Instead Plaintiffs were led to believe by Stanford Financial and Defendants that an investment in SIB was safer than any other investment in the market because it was underwritten by Lloyd's of

London based on "stringent" annual risk management audits conducted by outside audit firms. Now Plaintiffs stand to lose all of their investments.

## IX. CLASS ALLEGATIONS

72.

Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Over 5,000 Venezuelan investors have money invested with Stanford Financial through SIB. The number of affected investors are so numerous that joinder of all members is impracticable. There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Plaintiffs' claims are typical of the class claims. The Named Plaintiffs have no interest adverse to the interests of other members of the Class. The Named Plaintiffs will fairly and adequately protect the class' interests. The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international litigation.

73.

Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

    i.    All Venezuelan citizens and legal residents, or entities owned or controlled by Venezuelan citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims have been recognized and authorized by the Receiver; and

    ii.    Such other classes or sub-classes as the Court may determine.

        Excluded from the class are:

        a.    Defendants, and their employees and agents; and

b.    Any officer, director, employee, or promoter of Stanford Financial, including SIB and Stanford Venezuela, as those entities have been defined herein

74.

The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## X.    STATUTE OF LIMITATIONS DEFENSES

### Discovery Rule/Inquiry Notice

75.

The SEC filed an action against Allen Stanford and SIB *et al.* on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants until then.  Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud until now.

## XI.  CLASS CAUSES OF ACTION

**(THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF ALL PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)**

## A. Primary Violations of the Texas Securities Act

### 1. Sales of Securities through Untruths or Omissions

76.

Section 33(A) of the Texas Securities Act provides civil liability for persons who sell securities by means of untrue statements or omissions. As alleged by the SEC, the SIB CDs qualify as "Securities" under the relevant securities law jurisprudence. Defendants qualify as "sellers" under the Act because they acted as the soliciting agents of Stanford Financial and SIB in the chain of the selling process by communicating misleading information about SIB to the general public in Venezuela with the goal of selling SIB CDs, and but for Defendants' participation, Stanford Financial could not have sold the SIB CDs to Plaintiffs. In acting as Stanford Financial and/or SIB's sales agents, Defendants were motivated to serve their own financial interests or those of Stanford Financial and/or SIB.

77.

Defendants sold the SIB securities to Plaintiffs using untruths or omissions. In particular, Defendants, acting as the agents of Stanford Financial and SIB, created and sent into the stream of commerce the letters described herein which informed the general public that, *inter alia*, SIB was "*professional*" and comprised of "*first class business people*"; and that the Lloyd's insurance policies procured by Defendants for SIB were only issued because SIB had undergone "*stringent Risk Management Review[s] conducted by an outside audit firm*". These letters, which were clearly designed and intended by Defendants to be distributed to Plaintiffs as potential investors in SIB, contain untruths and omissions of material facts directed at Plaintiffs with the purpose of promoting and selling SIB and its CDs to Plaintiffs. Defendants had no reasonable basis to make these statements because they knew or should have known (and were therefore reckless in communicating

information to the contrary) that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by an outside audit firm, but rather were conducted by a one man audit shop in Antigua that was dominated completely by Stanford and SIB to the extent that it was not "outside" at all. At the very least, in creating and submitting these letters into the stream of commerce to be directed at Plaintiffs, Defendants omitted material facts, including the fact that Defendants had no idea one way or another whether the Risk Management reviews were stringent or not, and that said reviews were conducted by a one man "mom and pop" accounting firm in Antigua dominated by Stanford and SIB.[3]

78.

Furthermore, primary liability for violations of the Texas Securities Act attaches to Defendants based on a duty to disclose that arose when said Defendants chose to speak to the public regarding Stanford Financial and SIB. In choosing to accept Stanford Financial's and SIB's request to act as their agents in making and circulating in Venezuela the representations concerning SIB contained in the "safety and soundness" letters described herein, Defendants assumed a duty to disclose all of the information they knew about Stanford Financial and SIB and not to make partial disclosures that might, and did, convey a false impression about SIB. A Defendant may not deal in "half-truths" and Willis and BMB had more access to information regarding Stanford and SIB than Plaintiffs did, and clearly had an incentive to market and sell SIB to Plaintiffs so that SIB, and hence Stanford Financial, could continue in business and continue contracting Defendants' services. Moreover, Defendants were clearly on notice that the investing public in Venezuela, where these letters were circulated, would and did rely on Defendants' statements in making their investment

---

3       An omitted fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in deciding whether to invest.   See, e.g., *Bridwell v. State*, ___ S.W.3d ___, 2008 WL 467271 (Tex.App.-Dallas 2008).

decisions concerning buying the CDs offered by Stanford Financial and SIB; indeed the very purpose of the letters was to influence the investors' decision-making process in terms of SIB.

79.

As a result of Defendants' conduct, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last SIB account statement and the amount Plaintiffs may receive from the receivership distribution.

## B. AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

### 1. SALES OF UNREGISTERED SECURITIES

80.

Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs.  In particular, by their actions described herein, Defendants provided substantial assistance to SIB and Stanford Financial in the marketing and sales process and materially aided Stanford Financial and SIB to sell unregistered securities to Plaintiffs from, by and through Texas.  As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIB, with Defendants' participation, constitute "securities" under the relevant securities law jurisprudence.  By agreeing to assist Stanford Financial and SIB to sell and promote investment products, Defendants actively joined the Stanford Financial sales force and therefore knew or should have known that they were acting as links in the chain of selling unregistered securities to Plaintiffs from, by and through Texas.  But for Defendants' participation, Stanford Financial and SIB could not have sold unregistered securities to Plaintiffs from, by and through Texas.

81.

Defendants had general awareness that they were assisting an offshore, unregistered

investment company sell unregistered securities from, by and through Texas.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters attesting to the safety and soundness of SIB with full knowledge that the purpose of the letters was to lure more investors to invest in SIB.  In assisting an offshore bank sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  None of the CDs sold to Plaintiffs were ever registered with the Texas Securities Commission and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act.  In assisting Stanford Financial and SIB in the sales and marketing process to sell the unregistered securities from, by and through Texas, Defendants acted intentionally or with reckless disregard for the truth and the law.  As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

## 2. SALES OF SECURITIES BY UNREGISTERED DEALERS

82.

Defendants aided and abetted SIB and the Stanford Financial Group in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Defendants knew or should have known that Stanford Financial and SIB were collectively functioning as an unregistered investment company, selling hedge or mutual fund participation units from, by and through Texas to investors and then pooling its customers' money together to make

illiquid, speculative investments.

83.

Stanford Financial and SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, including Defendants, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, securities of which SIB was the issuer, without obtaining an order from the Texas State Securities Board permitting it to register as an investment company "dealer".

84.

Defendants intentionally and actively aided and abetted Stanford Financial to operate as an illegal hedge or mutual fund in Texas and sell securities from, by, and through Texas, by means of the conduct described herein. With full knowledge that Stanford Financial and SIB were collectively acting as an unregistered securities investment company "dealer" in Texas selling securities from, by, and through Texas, and that Stanford Financial and SIB were for all practical purposes being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial and SIB's violations of the Texas Securities Act by continuing to provide the letters herein described for the known purpose of luring new customers like Plaintiffs to Stanford Financial and SIB and selling them the worthless CDs.

85.

Defendants had general awareness that they were assisting an offshore, unregistered investment company "dealer" sell unregistered securities from, by and through Texas.   Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters attesting to the safety and soundness of SIB with full knowledge that the

purpose of the letters was to lure more investors to invest in SIB. In assisting an offshore bank sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality. In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law. In fact, in their zeal to assist SIB, an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, to sell its debt obligation securities from, by, and through Texas via Stanford Financial, Defendants acted with wanton and arrogant disregard for the protections afforded by the Texas Securities Act. As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 3. Untruth or Omission

### 86.

Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial and SIB and their principals in the sale of securities through the use of untrue representations or materially misleading omissions. In particular, and as set forth in the SEC's Amended Complaint, Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs. In particular, Stanford Financial led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office (including Defendants "safety and soundness" letters), to believe that their money was being invested in safe, liquid investments

that were completely insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments like private equity and real estate. Moreover, Stanford Financial failed to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, illegal mutual fund in violation of the Investment Company Act and the Texas Securities Act.

87.

Defendants had general awareness that they were involved in improper activity and that they were assisting an offshore, unregistered investment company sell unregistered securities from, by and through Texas. With knowledge that Stanford Financial and SIB, acting in concert as an unregistered investment company, were misleading investors about the scope and nature of insurance coverage and the extent of oversight over SIB, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SIB and Stanford Financial in the marketing and sales process, including the circulation of the letters described herein, and thereby materially aided the sales of securities through the use of untruths and materially misleading omissions. Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters attesting to the safety and soundness of SIB with full knowledge that the purpose of the letters was to lure more investors to invest in SIB. In assisting an offshore bank sell securities through a Houston-based investment company enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality. All of Defendants caused the fraudulent insurance letters to be generated, distributed through Stanford Financial's offices in Houston, Texas and circulated to Plaintiffs and the Class of investors in Venezuela, with full knowledge, or with reckless

disregard for the truth, that the purpose of the letters was to deceive investors about the scope and nature of insurance coverage as well as the degree of oversight of SIB required to obtain the insurance coverage, in order to lure investors like Plaintiffs and the Class to invest money in the SIB CDs through Stanford Financial. Said conduct was designed to perpetuate the Stanford Financial "myth" regarding the safety and security of the SIB CDs, and to support the marketing, promotional and sales activities described herein. Defendants' actions as described herein allowed Stanford Financial and SIB to continue to sell securities to Plaintiffs from, by and through Texas using untruths and materially misleading omissions.

88.

In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial, or acted with reckless disregard for the truth or the law. In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein. Defendants' actions in aiding and abetting Stanford Financial's fraud caused Plaintiffs to enter into transactions or maintain their investments with SIB. As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

4. CO-CONSPIRATOR LIABILITY

89.

Defendants are jointly and severally liable as co-conspirators for Stanford Financial and SIB's primary violations of the Texas Securities Act. In particular, Defendants, as a part of providing professional services to Stanford Financial as insurance agents, insurance brokers, risk managers and/or insurance consultants, knowingly combined together to assist Stanford Financial to operate as an "outlaw", unregulated, unregistered investment company/dealer, and to sell unregistered securities from, by and through the State of Texas. As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIB to accomplish the goal of selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## C. PARTICIPATION IN A FRAUDULENT SCHEME

90.

By their conduct described herein, Defendants aided and abetted and participated with Stanford Financial and SIB in a fraudulent scheme, making Defendants directly liable for fraud. In particular, Defendants made the conscious decision to participate in the scheme by joining the Stanford Financial sales force to market, promote and advertise SIB to prospective clients in order to assist and enable Stanford Financial to continue to sell SIB CDs based on the misrepresentations that investments in SIB were fully insured because SIB was subject to "stringent" audits and risk management reviews. Defendants' actions in participating in the fraudulent scheme are a proximate

cause of actual damages to Plaintiffs, being the difference between their investments in Stanford

Financial as stated in their last account statement and the amount Plaintiffs may receive from the

Receivership distribution.

### D. CIVIL CONSPIRACY

#### 91.

Defendants conspired with each other and with Allen Stanford, SIB, Stanford Financial and

SGC to commit the wrongful conduct described herein, including fraud and violations of the Texas

Securities Act. Defendants are each responsible for all wrongdoing done by each and the other

members of the conspiracy, including Allen Stanford, SIB, Stanford Financial and SGC, in

furtherance of the unlawful conspiracy and enterprise.

#### 92.

Together with Allen Stanford, SIB, Stanford Financial and SGC, the Defendants conceived,

participated in, and implemented a common enterprise to sell SIB CDs for the pecuniary benefit of

Stanford and Stanford Financial and, thereby, Defendants. The object of the conspiracy was to

market and promote Stanford Financial and SIB and so assist said entities to sell the SIB CDs in a

massive Ponzi scheme. There was a meeting of the minds between all Defendants and Allen

Stanford, SIB, Stanford Financial and SGC, as to the object to be accomplished and the means for

carrying out the scheme, namely the creation and circulation of the letters described herein to

facilitate the sale of the CDs to unsuspecting investors such as Plaintiffs. The acts and omissions of

Defendants were committed as a part of their professional services provided to Stanford Financial

and SGC while acting in their capacities as insurance agents, insurance brokers, risk managers and/or

insurance consultants.

93.

During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting Allen Stanford, SIB, Stanford Financial and SGC, in furtherance of the common enterprise, engaged in specific overt acts as described herein, being the creation and transmittal of the "safety and soundness" letters into the stream of commerce. Each of the Defendants engaged in overt acts in furtherance of the Stanford Financial CD conspiracy and effectuated their illicit scheme through and with the assistance and cooperation of Allen Stanford, SIB, Stanford Financial and SGC.

94.

Defendants conspired to conduct, and participated in conduct including violations of securities laws and fraud. To wit, over the span of over ten years, Defendants, in conspiracy with Allen Stanford, SIB, Stanford Financial and SGC, knowingly participated in marketing and promoting the sale, from, by and through Texas, of the SIB CDs designed to facilitate the misapplication of fiduciary property via a massive Ponzi scheme, as described herein. Defendants' participation in the conspiracy proximately caused Plaintiffs to lose their investments.

## XII. <u>INDIVIDUAL CAUSES OF ACTION</u>

### A. COMMON LAW FRAUD

95.

Defendants' representations as described herein and contained in the "safety and soundness" letters attached hereto as Exhibit "4" constitute common law fraud, which caused Plaintiffs Manuel Canabal, Daniel Gomez Ferreiro and Promotora Villa Marina, C.A. damages for which they should recover by law. Defendants, in the course of their business relationships with Stanford Financial, made material representations to Plaintiffs via the "safety and soundness" letters which Defendants knew and intended, or had reason to expect, would eventually be transmitted to Stanford Financial

investors such as Plaintiffs.  Defendants and their employees and agents knowingly made the misrepresentations contained in the "safety and soundness" letters, and/or recklessly made the representations contained in said letters as positive assertions without any knowledge of their truth. Acting on behalf of Stanford Financial and at its behest, Defendants created and transmitted the letters with the intention that they reach investors like Plaintiffs and with the intention that investors like Plaintiffs act upon the representations by investing in, or continuing to maintain investments in, SIB CDs.  Plaintiffs received the "safety and soundness" letters created and transmitted by Defendants and justifiably relied upon them, and based upon them and the information provided by Stanford Financial, formed the belief that the SIB CDs were insured.  As a direct and proximate result of Plaintiffs' reliance on Defendants' fraudulent misrepresentations, Plaintiffs suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## B.  NEGLIGENT MISREPRESENTATION

### 96.

Defendant's representations as described herein and contained in the "safety and soundness" letters attached hereto as Exhibit "4" constitute negligent misrepresentations, which caused Plaintiffs Manuel Canabal, Daniel Gomez Ferreiro and Promotora Villa Marino, C.A. damages for which they should recover by law.   Defendants, in the course of their business relationships with Stanford Financial in which Defendants had a pecuniary interest, supplied false information to Stanford Financial with full knowledge, and indeed intending, or in the alternative fully expecting, that said information would be transmitted to investors like Plaintiffs Manuel Canabal, Daniel Gomez Ferreiro and Promotora Villa Marino, C.A., who in turn would rely on and be guided by said information in making their own investment decisions. Defendants and their employees and agents

did not exercise reasonable care or competence in obtaining or communicating the false information to Plaintiffs via Stanford Financial.  Plaintiffs Manuel Canabal, Daniel Gomez Ferreiro and Promotora Villa Marino, C.A. all received and relied on the "safety and soundness" letters transmitted by Defendants and were justified in relying on Defendants' false representations contained therein.  As a direct and proximate result of Plaintiffs' reliance on Defendants' negligent misrepresentations, Plaintiff suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## C.  NEGLIGENCE

### 97.

Pleading in the alternative, Defendants Willis, BMB, Amy S. Baranoucky and Robert S. Winter were negligent when acting in their capacities as insurance agents, insurance brokers, risk managers and/or insurance consultants while providing their professional services by failing to adequately ensure that the language in the safety and soundness letters properly described the existing insurance coverages.  Defendants acts and/or omissions proximately caused damage to plaintiff.  Willis and BMB were also negligent for failing to properly supervise its employees who were at all times acting in the course and scope of their employment and such negligence proximately caused the damages sought herein.

## XIII.  JOINT ENTERPRISE

### 98.

A joint enterprise existed between the various companies within the Stanford Financial group, all of which operated as, and were marketed and sold to the investing public as, Stanford Financial.  The joint enterprise consisted of, *inter alia*, SGC, SIB, SCM, Stanford Trust Louisiana,

Stanford Trust Antigua, Stanford Group Venezuela Asesores de Inversion, C.A. and Stanford Corporate Services. There existed an express or implied agreement between the above described entities and their principals concerning the establishment and administration of the joint enterprise; a common purpose to be carried out by the above described entities and their principals, being the reaping of fees and profits from the illicit activities of the joint enterprise; a community of pecuniary interest among the above described entities and their principals; and the above described entities and their principals shared in the management and direction of the joint enterprise. Thus, a joint enterprise existed between and among the above described entities and their principals, which is responsible for the fraudulent acts described herein, making them all jointly and severally liable for the fraudulent acts described herein.

## XIV. **ALTER EGO**

99.

Defendant Willis Group is directly liable for the acts and omissions of Willis Colorado as described herein for the reason that Willis Colorado is the alter ego of Willis Group and a conduit by which Willis Group conducted the business, including the schemes, described herein. Specifically, Willis Group owns, controls, and dominates Willis Colorado to such an extent that Willis Colorado in reality functions as a mere division or branch of Willis Group. Indeed Willis Group and all of its subsidiaries, including Willis Colorado, operate as one single unified worldwide business unit, all operating under the Willis Group brand, international trademark or tradename and logo, which is prominently displayed on all of the Willis Group entities' correspondence. Willis Group controls the manner in which its subsidiaries, such as Willis Colorado, are perceived by the public and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit. Indeed Willis Group's own website touts its "Global" approach to

client service, in which Willis Group "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide.

100.

Willis Group and all of its subsidiaries operate as a single economic unit under a "One Flag culture" centered on its Client Advocate and Global service model, and as a result of those business strategies Willis Group effectively dominates, formulates, directs and controls all of its subsidiaries' operations under the Willis worldwide umbrella. Willis' "One Flag" approach "guarantees" that all of Willis' worldwide employees, wherever they are located, "work as part of one cohesive team". For all effective purposes, and certainly for purposes of this lawsuit, Willis Colorado and Willis Group are one and the same because that is the perception that Willis seeks to create in the minds of third parties worldwide, including Plaintiffs.

## XIII. AGENCY

101.

Defendants acted at all times as the agents of Stanford Financial and SIB. In agreeing to sign the "safety and soundness" letters as Stanford Financial and SIB's insurance brokers, Defendants agreed to serve as Stanford Financial and/or SIB's agents in the marketing process for the sales of the SIB CDs. In preparing the text of the "safety and soundness" letters and asking Defendants to execute them for subsequent distribution to Plaintiffs and the Class, Stanford Financial and/or SIB authorized Defendants to act for them and subject to their control. As such, Stanford Financial and/or SIB had the right to control both the means and the details of Defendants' actions with respect to the "safety and soundness" letters. The Stanford Financial Advisors acted at all times as agents of Stanford Financial and SIB in Venezuela in operating and managing Stanford Venezuela with the sole objective of promoting and selling Stanford Financial and SIB products in Venezuela.

Defendants Willis and BMB acted as the agents of Stanford Financial and SIB in creating and circulating the letters described herein with the sole objective of promoting and selling Stanford Financial and SIB and their products in Venezuela.

102.

Furthermore Defendant Willis Colorado and Baranoucky acted at all times as the agent(s) of Willis Group, including with respect to their general and specific jurisdictional contacts with the State of Texas, under the theories of actual, apparent and agency by estoppel. Willis Group has purposefully created the appearance of authority that Willis Colorado and Baranoucky act on behalf of Willis Group by allowing Willis Colorado (as well as its other subsidiary companies) and Baranoucky to prominently display the Willis Group brand, international trademark or tradename and logo on all of their correspondence. Willis Group controls the manner in which its subsidiaries, such as Willis Colorado, are perceived by the public and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit. Indeed Willis Group's own website touts its "Global" approach to client service, in which Willis Group "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide. As an employee of this global, cohesive and consolidated joint enterprise, Baranoucky also acted as a direct agent of Willis Group with regard to the allegations made herein.

## XVI. RESPONDEAT SUPERIOR

103.

Defendants Willis and BMB are liable for the tortious acts of their employees, including without limitation, Amy S. Baranoucky (Willis) and Robert S. Winter (BMB), and all contacts with the State of Texas by those employees should be attributed to the specific employees' principals for purposes of the personal jurisdiction analysis. All of these employees (including without limitation

Amy S. Baranoucky [Willis] and Robert S. Winter [BMB]) were acting within the course and scope of their employment with Defendants, in their capacities as insurance agents, insurance brokers, risk managers and/or insurance consultants, and in furtherance of their respective principals' businesses, when they engaged in the wrongful conduct described herein. The Stanford Financial Advisors were at all times acting within the course and scope of their employment with Houston-based SGC and/or Stanford Financial , and in furtherance of said companies' respective businesses, when they engaged in the wrongful conduct described herein.

## XVII.  ACTUAL DAMAGES

104.

Plaintiffs and the Class have suffered the loss of well in excess of $1.6 billion that was proximately caused by the wrongful conduct of Defendants described herein. In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them. Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

105.

The exact amount of maximum damages proximately caused by Defendants' wrongful conduct is unknown, but Plaintiffs believe that those damages exceed $1.6 billion.

## XVIII.  PUNITIVE DAMAGES

106.

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code. Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

107.

All conditions precedent to filing this Complaint have been met.

## XVII.  <u>JURY DEMAND</u>

108.

Plaintiffs demand a trial by jury.

## <u>PRAYER</u>

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

**STRASBURGER & PRICE, LLP**
300 Convent Street, Suite 900
San Antonio, Texas 78205
Telephone:  (210) 250-6000
Facsimile: (210) 250-6100


By:  s/ Edward F. Valdespino
      EDWARD F. VALDESPINO
      State Bar No. 20424700
      edward.valdespino@strasburger.com
      ANDREW L. KERR
      State Bar No. 11339500
      andrew.kerr@strasburger.com

      DAVID N. KITNER
      State Bar No. 11541500
      david.kitner@strasburger.com
      STRASBURGER & PRICE, LLP
      901 Main Street, Suite 4400
      Dallas, Texas  75202
      Telephone: (214) 651-4300
      Facsimile: (214) 651-4330


**LEAD CLASS COUNSEL AND
ATTORNEYS IN CHARGE
FOR PLAINTIFFS
AND THE PUTATIVE CLASS**

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas  78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210


By:  s/ Edward C. Snyder
      EDWARD C. SNYDER
      State Bar No. 00791699
      esnyder@casnlaw.com
      JESSE R. CASTILLO
      State Bar No. 03986600
      jcastillo@casnlaw.com

# EXHIBIT 1

THE STATE OF TEXAS  §
                          §

COUNTY OF HARRIS   §

## AFFIDAVIT OF TRANSLATION

      Before me, the undersigned Notary appears RAMON M. DEL VILLAR who, after being first duly sworn, deposes and says that the facts contained herein are true and correct and based upon his personal knowledge:

      1.     "My name is Ramón Miguel del Villar. I am over the age of twenty-one years and competent to make this affidavit. I have personal knowledge of all the facts stated in this affidavit and they are true and correct.

      2.     I am a court interpreter certified for Spanish/English proceedings by the Administrative Office of the United States Courts.

      3.     I am an attorney licensed in the State of Texas with Texas State Bar Number 00785814.

      4.     I am the Chief Interpreter for the United States District Court, Southern District of Texas.

      5.     I am the holder of license number 292 as a State of Texas court interpreter.

      6.     I hereby certify that the document attached hereto is an English translation of two Spanish documents, one undated with the heading: "Safety," the other a letter signed by Rossana Roys in her capacity as Vice President, Stanford Financial Group, dated June 12, 1996.

      7.     I further certify that said translation is a fair and accurate translation of the poorly drafted and punctuated Spanish language document provided to me for translation of which a copy is kept in my records."

FURTHER AFFIANT SAYETH NOT.

 

                                    RAMON M. DEL VILLAR

 

      BEFORE ME, the undersigned Notary Public, appeared today RAMON M. DEL VILLAR who, having first been placed under oath, under his oath stated that he is the

person whose signature appears affixed to the foregoing statement and further stated under his oath that what said statement contains is of his personal knowledge and true and correct.

SUBSCRIBED before me on this 25th day of June of 2009.



Notary Public in and for the State of Texas

My commission expires:

KAREN D. HARFOLD
MY COMMISSION EXPIRES
May 25, 2013

2

STANFORD FINANCIAL GROUP

Rossana Roys
Vice President

Houston, June 12, 1996

Dear         :

I was very pleased to have a conversation with you yesterday afternoon and thank you for your interest and the time you gave me to briefly detail for you the services of Stanford International Bank Ltd., our affiliate bank. Further, I take this opportunity to formally introduce myself and make myself available for any assistance you may need!

As I mentioned over the phone, Stanford International Bank Ltd., based on Antigua, West Indies, belongs to our Group, Stanford Financial Group, which is a totally American company based in Houston, Texas. Stanford Financial Group provides promotion and information services for Stanford International Bank Ltd. and other companies of the Group to investors that are neither citizens nor residents of the United States, providing personalized attention to the clients of the Bank, jointly with strict confidentiality, safety and efficiency.

The Fixed-Term Certificate of Deposit "Flex CD", is the account that is promoted the most and that I would suggest you should consider among your investment plans to diversify funds. The Flex CD may be opened with a minimum of $10,000.00 U.S., with the flexibility of being able to increase the account at any time with deposits of a minimum of $5,000.00 or more, benefiting from the same rate and without it changing the date it becomes due.

For withdrawals there is the flexibility of being able to withdraw up to 25% of the capital, before the due date and without penalty, providing you availability of funds in 5 working days. Interests accrue in a compound manner daily, based on a calendar year of 365 days and by instructions of the client, interests may be issued monthly, tri-monthly, or be automatically reinvested into the principal, which provides a greater compound interest "yield".

Page 2

June 12, 1996

In the Flex CD of $100,000.00 U.S. or more, interest becomes automatically adjustable without your having to be concerned with the fluctuation of interest. This means that if the rates go up during the term, your interest would automatically go up to what the term elected is earning at that time, but if the rates were to go down, the Bank guarantees you to respect the initial rate with which you opened the account.

If you are considering investing $100,000.00 U.S. or more and it is money you are not thinking of touching but you want to capitalize with a good yield, I do suggest you to invest at a term of longer than 12 months to earn a better rate in that you would not have to worry in case interest rates go down during the term, and have the peace of mind of having 25% of your principal available to withdraw without any penalty and with a 5-day notice.

I invite you to go over the information carefully and get in touch with me for any question you may have or for me to indicate the procedures to be followed. To open the account it is not necessary for you to travel to Houston. The account may be opened through a Wire Transfer of Funds or with a personal check.

From Mexico you can call me toll-free at 95-800-345-2486. If I am not in the office please ask for Miss Claudia Martinez, who will help you gladly during my absence. I will have a work-related trip to Lima, Peru, the week of June 17, maintaining daily contact with the office, where I will be back on Monday June 24.

I hope to have the pleasure of being helpful to you and be able to count you as one of my distinguished clients. Wishing to meet you personally in a near future and wishing you a nice week, I remain.

Sincerely,

Rossana R

Rossana Roys


P.S. You mentioned that you had been in a fishing trip. If you may be interested in fishing in Venezuela at some point in time, let me know because I have some Venezuelan friends who love fishing / they have a

camper for this kind of activity and the catch is fabulous!   Rossana

STANFORD FINANCIAL GROUP

*Rossana Roys*
*Vice President*

Houston, 12 de Junio de 1996

Estimado            :

Me dió mucho gusto conversar con usted ayer por la tarde y agradezco su interés y el
tiempo que me brindó para detallarle brevemente los servicios de Stanford International
Bank Ltd, nuestro Banco afiliado.    Asimismo aprovecho esta oportunidad para
formalmente presentarme y ponerme a sus órdenes!

Como le mencioné por teléfono, Stanford International Bank Ltd., con sede en Antigua,
West Indies, pertenece a nuestro Grupo, Stanford Financial Group, que es una compañía
netamente americana con sede en Houston, Texas.    Stanford Financial Group provee
servicios de promoción e información para Stanford International Bank Ltd. y otras
empresas del Grupo a inversionistas que no son ni ciudadanos ni residentes de los
Estados Unidos,    brindando atención personalizada a los clientes del Banco,
conjuntamente con estricta confidencialidad, seguridad y eficiencia.

El Certificado de Depósito a Plazo Fijo "Flex CD",  es la cuenta que más se promueve y
que le sugeriría considerar entre sus planes de inversión para diversificar fondos.  El Flex
CD  se puede abrir con un mínimo de US$10,000.00,  con la flexibilidad de poder ir
aumentando la cuenta en cualquier momento con depósitos mínimos de $5,000.00 ó más,
beneficiándose de la misma tasa y sin que le cambie la fecha de vencimiento.

Para retiros se tiene la flexibilidad de poder retirar hasta un 25% del principal, antes del
vencimiento y sin penalidad, brindándole disponibilidad de fondos en 5 días hábiles.
Los intereses se acumulan en forma compuesta diariamente, basados en un año calendario
de 365 días y por instrucciones del cliente, los intereses pueden ser emitidos mensual,
trimestralmente, ó reinvertirse automáticamente al capital, lo que le brinda un mayor
interés compuesto "yield".

Página 2

Junio 12, 1996

En los Flex CD de US$100,000.00 o más, el interés se vuelve ajustable automáticamente sin que usted se preocupe de estar pendiente de la fluctuación de los intereses. Esto significa que si las tasas suben durante el término, el interés automáticamente le subiría a lo que el término elegido devengue en ese momento, pero si las tasas bajaran, el Banco garantiza respetar la tasa inicial con que se abrió la cuenta.

Si usted está considerando invertir US$100,000.00 ó más y es un dinero que no lo piensa tocar sino que desea se capitalice con un buen rendimiento, si le sugiero invertir a un término mayor de 12 meses para devengar una mejor tasa ya que usted no tendría que preocuparse en caso bajaran los intereses durante el término, y tendría la tranquilidad de contara con un 25% de su principal que puede retirarlo sin penalidad y con 5 días de aviso.

Lo invito a que revise detenidamente la información y se comunique conmigo para cualquier pregunta que pueda tener ó indicarle los procedimientos a seguir. Para abrir la cuenta no es necesario que usted venga personalmente a Houston. La cuenta puede abrirse por medio de Transferencia Cablegráfica de Fondos ó mediante un cheque personal.

Desde México puede llamarme gratuitamente al 95-800-345-2486. Si no estuviera en la oficina favor de preguntar por la Srta. Claudia Martínez, quien lo atenderá gustosamente durante mi ausencia. Yo estaré de viaje por trabajo en Lima, Perú, la semana del 17 de Junio, manteniéndome en contacto diario con la oficina, a donde me tendrá de regreso el L unes 24 de Junio.

Espero tener el gusto de poderlo servir y contarlo entre nuestros distinguidos clientes. Deseando conocerlo personalmente en un futuro cercano y deseándole una feliz semana, me despido.

Atentamente,

Rossana Roys

P.D: Me mencionó que había estado en un viaje de Pesca. Si alguna vez el interesara pescar en Venezuela, avíseme ya que conozco a unos amigos mexicanos que les fascina la pesca y tienen un campo para este tipo de actividad y la pesca es fabulosa! Rossana

# EXHIBIT 2

THE STATE OF TEXAS      §
                        §
COUNTY OF HARRIS        §

## AFFIDAVIT OF TRANSLATION

Before me, the undersigned Notary appears RAMON M. DEL VILLAR who, after being first duly sworn, deposes and says that the facts contained herein are true and correct and based upon his personal knowledge:

1.      "My name is Ramón Miguel del Villar. I am over the age of twenty-one years and competent to make this affidavit. I have personal knowledge of all the facts stated in this affidavit and they are true and correct.

2.      I am a court interpreter certified for Spanish/English proceedings by the Administrative Office of the United States Courts.

3.      I am an attorney licensed in the State of Texas with Texas State Bar Number 00785814.

4.      I am the Chief Interpreter for the United States District Court, Southern District of Texas.

5.      I am the holder of license number 292 as a State of Texas court interpreter.

6.      I hereby certify that the document attached hereto is an English translation of a Spanish document with the heading: "Stanford. What protection does Stanford International Bank offer its depositors?"

7.      I further certify that said translation is a fair and accurate translation of the poorly drafted and punctuated Spanish language document provided to me for translation of which a copy is kept in my records."

FURTHER AFFIANT SAYETH NOT.

_____
RAMON M. DEL VILLAR

BEFORE ME, the undersigned Notary Public, appeared today RAMON M. DEL VILLAR who, having first been placed under oath, under his oath stated that he is the person whose signature appears affixed to the foregoing statement and further stated

1

under his oath that what said statement contains is of his personal knowledge and true and correct.

SUBSCRIBED before me on this 18th day of June of 2009.

Notary Public in and for the State of Texas

My commission expires:  5/6/2011

2

## Stanford

*What protection offers Stanford International Bank to its depositors?*

The funds of Stanford International Bank and its clients are protected by one of the insurance programs, <u>**unique in its class**</u>, that provide the following coverage:

Insolvency policy that insures the funds that **SIB** maintains in deposit with correspondent institutions, including a coverage of the excess over the FDIC in case of United States banks. This policy is issued by **Brit Insurance Ltd. and scored by AM. Best** *"A+"* **(Excellent) and by Fitch** *A+.*

General bond for bankers with **Lloyds of London**, one of the insurance companies with great reputation and more important of London and the score granted by AM. BEST is *"AA-"* (Excellent).

Policy of liability of directors and executives with **Lloyds of London** scored by AM. BEST *"AA+"* (Excellent).

All the correspondent banks utilized by **Stanford International Bank** have great reputation (**TORONTO DOMINION BANK, UBS and HSBC**) have already been pre-approved by the insurance companies that issued the policies for the coverage that these institutions require to guarantee our operations in their banks and thus guarantee the funds that SIB maintains in these institutions for any insolvency of some of these banks.

To be able to qualify **Stanford International Bank**, and to have the following coverage the Bank is audited annually by the insurance companies. Another external company also makes a risk analysis to determine if the Bank is doing everything necessary to protect its assets. This provides another safety element for the clients. These policies have been kept in **SIB** for **over 20 years** granting firmness and seriousness, to over 75,000 clients in the world, and to the almost **$6 billion dollars in** direct **deposits** in instruments that belong to SIB.

In general, financial institutions that do not make commercial loans are safer than those who do, investment banks and those who do not make commercial loans are not exposed to this type of risk. One of the main causes for which a bank goes bankrupt is due to its portfolio of uncollectible loans. Throughout the years, banks around the world have experienced problems with loans that it has not been possible to collect. This is our greater virtue, why Stanford being *Private Investment Banking* only engaged in seeking safe products with stable earnings and with the minimum investment exposure risk, this offers a without par advantage the funds of its clients are in investments in which there are always positive results and in favor of the interests and assets of the institution.

**Stanford International Bank** in its investment funds same as the banks with the better reputation makes its investments of the greater part of its assets in titles such as **first grade investment bonds (AAA, AA+, AA)** and shares of stock (of great reputation, liquidity and credibility) and in negotiable instruments in the financial markets and easily made liquid should it be necessary. In contrast, commercial banks or savings banks normally place a big part of their funds in loans which are not easily made liquid upon requirements of the bank to be able to have cash liquidity and also possess other long term assets given as guarantee which are not easily made liquid in a fast market, which is why these commercial banks only maintain a minimum part of their available funds which makes them by very susceptible to any instability of liquidity and availability for their clients should it be needed.

Debtors of **Stanford International Bank** are the issuers of the titles that the Bank maintains in its portfolio (renowned companies, multinationals and prestigious international banks) whose risk of insolvency is minimum.

The Bank has resources available for productive investments greater than the total of deposits in that the Bank also has available for this purpose most of its capital (The long term assets of the Bank are minimal).

The Clients of Stanford International Bank come from 102 countries. This great diversification minimizes the exposure of a regional market.

Because **Stanford International Bank** is not a United States bank, it is not covered by the FDIC insurance (Federal Deposit Insurance Company). Nevertheless nowadays FDIC provides only a relatively poor protection, that has not been changed since 1929: where FDIC, First, only covers up to $100,000 per account/client. Second, currently the reserve funds of FDIC only cover a minimum part of the deposits of all the banks that are insured in a proportion of 1 to 1000 and in the third place, FDIC does not make any bank safer, nor prevents a bank from becoming bankrupt, the banks that go bankrupt do so because of bad practices in the use of their resources and investments, where FDIC is very clear and states that there is no coverage whatsoever of Federal insurance for this type of bankruptcies.

American banks in case of a need to cover the funds by the FDIC, the client must directly address in a personal manner the governmental agency that would be in charge of programming the payments to its depositors in case an institution has to be covered for being insolvent, but there is no FDIC coverage should the bank go bankrupt because of conversion of the deposits and funds of its clients.

**NASD** and **SIPC**, , are two safety entities that are utilized by the New York stock exchange, where **Stanford Group** is a member, which insure that the financial companies that invest the funds of their clients in financial instruments of any kind that are traded in the stock exchange, be invested in companies that

represent for the stock exchange of high security and trust for these two supervision and guarantee entities in the stock exchange markets, measuring firmness and safety so that the funds utilized be well invested.

***Stanford International Bank is probably the only International Bank that offers this type of security to its clients.***

Thank you for considering us for your next investment.

 **Stanford**

### Que protección le ofrece Stanford International Bank a sus depositantes?

Los fondos de Stanford International Bank y de sus clientes están protegidos por uno de los programas de seguros, **únicos en su clase**, que proporciona las siguientes coberturas:

Póliza de insolvencia que asegura los fondos que **SIB** mantiene en depósito en instituciones corresponsales, incluyendo una cobertura del exceso sobre el FDIC en caso de bancos norteamericanos. Esta póliza esta emitida por **Brit Insurance Ltd. y calificada por AM. BEST "A+" (Excelente) y por Fitch A+.**

Fianza general para banqueros con **Lloyds of London**, una de las empresas de seguros de alta reputación y más importante de Londres y la calificación otorgada por AM. BEST es de "AA-" (Excelente).

Póliza de responsabilidad de directores y ejecutivos con **Lloyds of London** calificada por AM. BEST "AA+" (Excelente).

Todos los bancos corresponsales utilizados por **Stanford International Bank** son de alta reputación (**TORONTO DOMINION BANK, UBS y HSBC**) ya han sido pre-aprobados por las compañías aseguradoras que emitieron las pólizas para la cobertura que estas instituciones requieren para garantizar nuestras operaciones en sus bancos y así garantizar los fondos que SIB mantiene en estas instituciones por cualquier insolvencia de alguno de estos Bancos.

Para poder calificar a **Stanford International Bank**, y para tener las siguientes coberturas el Banco es auditado anualmente por las compañías de seguros. Otra empresa externa también hace un análisis de riesgo para determinar si el Banco esta haciendo todo lo necesario para proteger sus activos. Esto proporciona otro elemento de seguridad para los clientes. Estas pólizas las han tenido en **SIB** por **más de 20 años** otorgando solidez y seriedad, a más de 75.000 clientes en el mundo, y a los casi **$6 Mil Millones de dólares en depósitos** directos en instrumentos propios de **SIB**.

En general, las instituciones financieras que no hacen préstamos comerciales son más seguras que aquellas que si lo hacen, la banca de inversión y que no hacen préstamos comerciales no se exponen a este tipo de riesgo. Una de las principales causa por la cual un banco quiebra es debido a su cartera de préstamos incobrables. A través de los años, los bancos alrededor del mundo han experimentado problemas por préstamos que no han podido cobrarse. Esta es nuestra mayor virtud, por la cual Stanford al ser *Private Investment Banking* donde solo se dedican a buscar productos seguros de rentabilidad estable y con el mínimo riesgo de exposición de inversión, esto ofrece una ventaja inigualable los fondos de sus clientes esta en inversiones en las cuales hay siempre resultados positivos y a favor de los intereses y activos de la institución.

Stanford International Bank en sus fondos de inversión al igual que los bancos de mas alta reputación hacen sus inversiones de la gran parte de sus activos en titulos tales como **bonos de primer grado de inversión (AAA, AA+, AA)** y acciones (de alta reputación, liquidez y credibilidad) y en instrumentos negociables en los mercados financieros y fácilmente liquidables en caso de ser necesario. En contraste, los bancos comerciales o los bancos de ahorros normalmente colocan una gran parte de sus fondos en préstamos los cuales no son fácilmente liquidables a requerimiento del banco para poder disponer de liquidez monetaria y también poseen otros activos fijos dados en garantia los cuales no son liquidables fácilmente en un mercado rápido, por lo cual estos bancos comerciales solo mantienen una mínima parte de sus fondos disponibles lo que hace muy susceptibles a cualquier inestabilidad de liquidez y de disponibilidad para sus clientes de ser requerida.

Los deudores de **Stanford International Bank** son los emisores de los titulos que el Banco mantiene en su cartera (compañías de renombre, multinacionales y bancos internacionales de prestigio) cuyo riesgo de insolvencia es minimo.

El Banco tiene recursos disponibles para inversiones productivas mayores del total de los depósitos ya que el Banco también tiene disponible para este efecto la mayor parte del capital (Los activos fijos del Banco son mínimos).

Los clientes de Stanford International Bank provienen de 102 países. Esta gran diversificación minimiza la exposición a un mercado regional.

Como **Stanford International Bank** no es un banco estadounidense, no lo cubre el seguro de FDIC (Federal Deposit Insurance Company). Sin embargo hoy el FDIC proporciona una protección relativamente pobre, que desde 1929 no ha sido cambiada: donde el FDIC, Primero, que solamente cubre hasta por $100,000 por cuenta/cliente. Segundo, actualmente los fondos de reserva del FDIC solo cubren una mínima parte de los depósitos de todos los bancos que están asegurados en una relación 1 a 1000 y en tercer lugar, el FDIC no hace mas segura a ningún banco, ni evita que un banco entre en quiebra, los bancos que quiebran son por mala practica en el uso de sus recursos e inversiones, donde el FDIC es muy claro y manifiesta que no existe ninguna cobertura del seguro Federal a este tipo de quiebras.

Los bancos americanos en caso de una necesidad de cubrir los fondos por el FDIC, el cliente deberá dirigirse directamente en forma personal al organismo gubernamental que se encargaría de programar el pago a sus depositarios en caso de tener que cubrir a una institución por insolvente, mas no existe la cobertura del FDIC en caso que el banco quiebre por malversación de los depósitos y fondos de sus clientes

El **NASD** y el **SIPC**, , son dos entes de seguridad que utiliza la bolsa de valores de New York, donde **Stanford Group** es miembro, los cuales aseguran que las empresas financieras que invierten los fondos de sus clientes en instrumentos financieros de cualquier índole que maneja en la bolsa, están invertidos en empresas que representan para la bolsa de alta seguridad y confianza para estos dos entes de vigilancia y garantía en los mercados bursátiles, midiendo la solidez y seguridad para que los fondos utilizados estén bien invertido.

*Stanford International Bank es probablemente el único Banco Internacional que ofrece este tipo de seguridad para sus clientes.*

Gracias por tomarnos en cuenta para su proxima inversión.

# EXHIBIT 3

THE STATE OF TEXAS          §
                            §
COUNTY OF HARRIS            §

## AFFIDAVIT OF TRANSLATION

Before me, the undersigned Notary appears RAMON M. DEL VILLAR who, after being first duly sworn, deposes and says that the facts contained herein are true and correct and based upon his personal knowledge:

1.      "My name is Ramón Miguel del Villar. I am over the age of twenty-one years and competent to make this affidavit. I have personal knowledge of all the facts stated in this affidavit and they are true and correct.

2.      I am a court interpreter certified for Spanish/English proceedings by the Administrative Office of the United States Courts.

3.      I am an attorney licensed in the State of Texas with Texas State Bar Number 00785814.

4.      I am the Chief Interpreter for the United States District Court, Southern District of Texas.

5.      I am the holder of license number 292 as a State of Texas court interpreter.

6.      I hereby certify that the document attached hereto is an English translation of two Spanish documents, one undated with the heading: "Safety," the other a letter signed by Rossana Roys in her capacity as Vice President, Stanford Financial Group, dated June 12, 1996.

7.      I further certify that said translation is a fair and accurate translation of the poorly drafted and punctuated Spanish language document provided to me for translation of which a copy is kept in my records."

FURTHER AFFIANT SAYETH NOT.

_____
RAMON M. DEL VILLAR

BEFORE ME, the undersigned Notary Public, appeared today RAMON M. DEL VILLAR who, having first been placed under oath, under his oath stated that he is the

1

person whose signature appears affixed to the foregoing statement and further stated under his oath that what said statement contains is of his personal knowledge and true and correct.

SUBSCRIBED before me on this 25th day of June of 2009.



Notary Public in and for the State of Texas

My commission expires:

KAREN D. HARPOLD
MY COMMISSION EXPIRES
May 25, 2013

**SAFETY**

**Stanford International Bank Ltd.** as an investment bank, does not make loans (unless they are guaranteed by fixed-term deposits) nor issues credit instruments of any kind. Commercial banks invest their funds in loans and credit operations that entail risk and that sometimes they do not recover, incurring big losses. Consequently, **Stanford International Bank Ltd.** does not have those kinds of risks and avoids that which is today the main cause of insolvency of commercial banking.

**Stanford International Bank Ltd.** invests its funds in a portfolio of securities that because it is highly diversified and managed under a criterion of maximum stability and cautiousness, has a minimal risk of loss, in that most of the portfolio is made up of bonds issued by the government of the United States or by multinational companies and banks with international prestige.

Further, to guarantee and give greater safety to its clients, **Stanford International Bank Ltd.** is the beneficiary of an insurance policy that guarantees the funds and investments in any amount and currency that the Bank maintains in its correspondent banks. Each one of these banks is previously approved by the insurance company. This means that in case of insolvency of these banks, that are the depositaries of the funds and investments, **Stanford International Bank Ltd.**, receives from the insurance company a full reimbursement of its deposits, which at the same time protects the clients of **Stanford International Bank Ltd.**

Besides, **Stanford International Bank Ltd.** has a fidelity policy (Banker's Blanket Bond) that covers all financial transactions of the Bank in case of loss, swindle or theft. This policy is extraordinarily difficult to acquire and few banks are able to satisfy the requirements to obtain it.

The two insolvency guarantee policies (Depository Insolvency Policy and Excess FDIC Deposit Policy) are underwritten by Great American Insurance Co. and General Star Indemnity Co. respectively. Also, the fidelity policy (Bankers Blanket Bond) is underwritten by Great American Insurance Co. These two insurance companies (Great American Insurance Co. and General Star Indemnity Co.) are rated A and A++ respectively (Best's Key Rating Guide).

The insurance policies of Stanford International Bank Ltd. are managed by Bowen, Miclette, Descant & Britt, a subsidiary company of SEDGWICK JAMES OF HOUSTON, who is one of the main insurance brokers in the world. If you wish to confirm this information, please contact:                                          ➔

Mr. Robert Winter – Financial Specialist
Bowen, Miclette, Descant & Britt
1111 North Loop West, Suite 400
P.O. Box 922022
Houston, Texas 77292,2022
Tel: (713) 880-7100
Fax: (713) 880-7166

## SEGURIDAD

Stanford International Bank Ltd. como banco de inversión, no otorga préstamos (a menos que éstos estén garantizados por depósitos a plazo fijo) ni emite instrumentos de crédito de ningún tipo. Los bancos comerciales invierten sus fondos en préstamos y operaciones de crédito que conllevan riesgo y que a veces no logran recuperar, incurriendo en pérdidas cuantiosas. Por consiguiente, Stanford International Bank Ltd. no corre esa clase de riesgos y evita así lo que hoy es la causa principal de insolvencia de la banca comercial.

Stanford International Bank Ltd. invierte sus fondos en una cartera de valores que por estar altamente diversificada y administrada bajo un criterio de máxima estabilidad y cautela, tiene un riesgo de pérdida mínimo, ya que la mayoría de la cartera se compone de bonos emitidos por el gobierno de los Estados Unidos o por compañías multinacionales y bancos de prestigio internacional.

Asimismo, para garantizar y dar mayor seguridad a sus clientes, Stanford International Bank Ltd. es beneficiario de una póliza de seguros que garantiza los fondos y las inversiones en cualquier monto y moneda que el Banco mantiene en sus bancos corresponsales. Cada uno de estos bancos está previamente aprobado por la compañía aseguradora. Esto significa que en caso de insolvencia de esos bancos, que son los depositarios de los fondos e inversiones, Stanford International Bank Ltd., recibe de la compañía aseguradora el reintegro total de sus depósitos, lo que a su vez protege a los clientes de Stanford International Bank Ltd.

Además, Stanford International Bank Ltd. tiene una póliza de fidelidad (Banker's Blanket Bond) que cubre las transacciones financieras del Banco en caso de pérdida, estafa o robo. Esta póliza es sumamente difícil de adquirir y pocos bancos logran cumplir los requisitos para obtenerla.

Las dos pólizas de garantía de insolvencia (Depository Insolvency Policy y Excess FDIC Deposit Policy) están suscritas por Great American Insurance Co. y General Star Indemnity Co. respectivamente. También, la póliza de fidelidad (Bankers Blanket Bond) está suscrita por Great American Insurance Co. Estas dos empresas de seguros (Great American Insurance Co. y General Star Indemnity Co.) están clasificadas A y A++ respectivamente (Best's Key Rating Guide).

Las pólizas de seguros de Stanford International Bank Ltd. están administradas por Bowen Miclette, Descant & Britt, compañía subsidiaria de SEDGWICK JAMES OF HOUSTON, que es uno de los principales corredores de seguros del mundo. Si desea confirmar esta información, favor dirigirse a:

Sr. Robert S. Winter - Especialista Financiero
Bowen, Miclette, Descant & Britt
1111 North Loop West, Suite 400
P.O. Box 922022
Houston, Texas 77292-2022
Tel: (713) 880-7100
Fax: (713) 880-7166

# EXHIBIT 4



BOWEN, MICLETTE, DESCANT & BRITT
1111 NORTH LOOP WEST, SUITE 400
P.O. BOX 922022.
HOUSTON, TEXAS 77292-2022
(713) 880-7100
FAX: (713) 880-7166

January 16, 1996



Mr. Oreste Tonarelli
Director
Stanford Financial Group
201 South Biscayne Blvd.
Suite 1200
Miami, Florida 33131

RE:   STANFORD INTERNATIONAL BANK

Dear Mr. Tonarelli:

I have been doing business with Stanford International Bank for over eight years and find them to be first class business people.   Through Crump Financial Services, a Sedgwick subsidiary, we have placed the following coverages that are currently in effect:

1) The Bankers Blanket Bond Policy with Lloyds of London protects the bank from embezzlement by their own employees, burglary and robbery by others and from wire transfer fraud.

2) The Director's and Officer's Liability Policy with Lloyd's of London indemnifies the bank and its Directors and Officers against lawsuits.

3) The Depository Insolvency Policy underwritten by Great American Insurance protects the bank against the failure of their overseas depositories.

4) The Excess FDIC Deposit Policy underwritten by General Star Indemnity Company protects the bank against failure of their U.S. depositories.

In order to qualify for the above coverage, the Bank underwent a stringent Risk Management Review conducted by an outside audit firm.

We feel that you will be pleased with any dealings you have with Stanford International Bank. Please feel free to contact me if you have any further questions.

Sincerely,

Robert S. Winter
Financial Specialist                    Insurance/Bonds/Risk Management



BOWEN, MICLETTE, DESCANT & BRITT
1111 NORTH LOOP WEST, SUITE 400
P.O. BOX 922022
HOUSTON, TEXAS 77292-2022
(713) 880-7100
FAX (713) 880-7166

February 10, 1998


C/O Stanford Group Company
201 S. Biscayne Blvd. Ste. 1200
Miami, FL 33131


RE: Stanford International Bank


Dear

I have been doing business with Stanford International Bank for over ten years and find
them to be first class business people.   We have placed the following coverages that are
currently in effect.

    1)   Directors and Officers Insurance with Lloyds of London (Expiration 1/1/99)
    2)   Bankers Blanket Bond with Lloyds of London (Expiration 1/1/99)
    3)   Excess FDIC Insurance with General Star Indemnity (Expiration 7/1/98)
    4)   Depository Insolvency with Great American Insurance Co. (Expiration 1/1/99)

All of these coverages have been in effect for various terms for the past five to ten years,
however, no representations  can be made that such coverages will remain in effect.

In order to qualify for the above coverages, the Bank underwent a Risk Management
review conducted by an outside audit form,

We have found that all our dealings with the Bank have been conducted in a professional
and satisfactory manner .

Sincerely,

Robert S. Winter
Financial Specialist



Insurance/Bonds/Risk Management



January 21, 2004

BOWEN, MICLETTE & BRITT, INC.
1111 NORTH LOOP WEST, SUITE 400
P.O. BOX 922022
HOUSTON, TEXAS 77292-2022
(713) 880-7100
FAX: (713) 880-7166

RE:   STANFORD INTERNATIONAL BANK LIMITED

Dear Promotora Villa Marino:

I have been doing business with Stanford International Bank for over fifteen years and find them to be first class business people.  We have placed the following coverages that are currently in effect:

1)  Directors and Officers Insurance with Lloyds of London (Expiration 8/15/04);

2)  Bankers Blanket Bond with Lloyds of London (Expiration 8/15/04);

3)  Depository Insolvency with Great American Insurance Co. (Expiration 8/15/04)

All of these coverages have been in effect for various terms for the past six to twelve years, however, no representations can be made that such coverages will remain in effect.

In order to qualify for the above coverage, the Bank underwent a stringent Risk Management Review conducted by an outside audit firm.

We have found that all our dealings with the Bank have been conducted in a professional and satisfactory manner.

Sincerely,

Robert S. Winter
Financial Specialist

Insurance/Bonds/Risk Management

# Willis

November 15, 2006

Telephone  (303) 218-4070
Fax  (303) 218-4058
Website  www.willis.com

Direct Line  (303) 218-4037
Direct Fax  (303) 218-4058
E-mail  Amy.Baranoucky@willis.com

Mr. Manuel Canabal

Caracas
VENEZUELA

RE:   STANFORD INTERNATIONAL BANK LIMITED

Dear Mr. Canabal:

We are the insurance broker for Stanford International Bank and find them to be first class business people.  We have placed the following coverages that are currently in effect:

1.   Directors and Officers Liability Insurance with Lloyds of London (Expiration 8/15/07);

2.   Bankers Blanket Bond with Lloyds of London (Expiration 8/15/07);

All of these coverages have been in effect for various terms for the past six to twelve years, however, no representations can be made that such coverages will remain in effect.

In order to qualify for the above coverages, the Bank underwent a stringent Risk Management Review conducted by an outside audit firm.

We have found that all our dealings with the Bank have been conducted in a professional and satisfactory manner.

Sincerely,

Amy S. Baranoucky
Vice President
Executive Risks

Willis of Colorado, Inc.
Independence Plaza
1050 17th Street
Suite 750
Denver, CO  80265

# EXHIBIT 5

We need to talk!!


From: Frans Vingerhoedt [fvingerhoedt@msn.com]
Sent: Friday, February 06, 2009 11:27 PM
To: Stanford, Allen

Subject: We need to talk!!
Allen we need to talk soonest! I have no doubt you are going crazy and are doing whatever is humanly possible to remedy the situation, but things are starting the unravel quickly on our side in the Caribbean and Latin America. We need to get a strategy together before the floodgates of withdrawals starts from our side (on top of the US).

We have obvious cash flow problems and have increasingly more difficulties in explaining clients why WT are delayed for more and more time. We have no answers. Clients are completely restless and their only comfort is our word.

The BS answers we get from JRT and SIB only add to the anxiety.

We need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank starting next week.

We all know what that means. There are real bullets out there with my name on, David's name and many others and they are very real.

Please give        me a call or let's get together in Miami over the weekend. We are all in this together. We cannot hold the fort and certainly not jump start production if we are completely in the dark. Strain is building quickly amongst FCs.

1